Michael D. Braun (SBN 167416)
**KUZYK LAW, LLP**
1999 Avenue of the Stars, Ste. 1100
Los Angeles, California 90067
Telephone:  (213) 401-4100
Facsimile:   (213) 401-0311
Email:  mdb@kuzykclassactions.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JIMY RUIZ on behalf of himself and all others similarly situated,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**CELSIUS HOLDINGS INC.**<br><br>**Defendant.** | **CASE NO.: '21CV128 JM KSC**<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Jimy Ruiz ("Plaintiff"), individually and on behalf of himself and all others similarly situated, brings this class action against Defendant Celsius Holdings Inc. ("Celsius" or "Defendant") and on the basis of personal knowledge, information and belief, and the investigation of counsel, alleges as follows:

## INTRODUCTION

*"The difference between a product that contains a characterizing food ingredient and a product that contains no such ingredient…. is very important to the value of the product and thus to the consuming public."[1]*

1.      This is a proposed class action on behalf of a nationwide class and a California sub-class (collectively, "Class") of consumers seeking redress for Defendant's deceptive practices associated with the advertising, labeling and sale of its fitness beverages.

2.      Defendant Celsius manufactures, markets, advertises, and sells a line of fitness beverages that are touted as "healthy energy" drinks with "no preservatives artificial colors or flavors." The beverages are based on a proprietary formulation that provides a number of vitamins, minerals and other healthful ingredients such as guarana, ginger root and green tea ("Beverages" or "Products").

3.      Although the beverage market is highly competitive, Celsius successfully markets its Products as being "healthier" and "as natural as possible" as compared to other energy drinks.

4.      The success of this marketing campaign is undeniable, and has resulted in massive year to year revenue growth. In the third quarter of 2020 alone, Celsius reported $36.84 million in revenue, representing an 80.4% increase over revenue for the same period a year earlier.

---

[1] Federal Register Vol. 38, No. 231, December 3, 1973.

1    5.    Plaintiff was a frequent purchaser of Celsius Beverages including one
2    characterized as Sparkling Orange.  The front label (aka "principal display panel") of
3    the Beverage container characterizes it as "orange" by both name (set off in the color
4    orange) and by a large vignette of a sliced orange.



20    6.    Despite being characterized as an "orange" beverage, however, the
21    Product does not contain its characterizing ingredient (i.e., orange), but rather derives
22    its taste from a lab synthesized ingredient defined obtusely as "natural flavor."  By
23    characterizing the Product in this manner – failing to either include its characterizing
24    ingredient, or alternatively, clearly indicating on the Product's principal display panel
25    that it is a "flavored" beverage, Celsius has falsely and misleadingly labeled its
26    Products, deceived its consumers, and violated the law.
27    7.    Throughout the applicable class period, Defendant falsely represented the
28    nature of its fitness beverages and as a result of this false and misleading labeling, was

able to sell these Products to tens of thousands of unsuspecting consumers throughout California and the United States, and to profit thereby.

8.      Plaintiff alleges Defendant's conduct is in breach of warranty, violates California's Business and Professions Code § 17200, *et. seq.,* California's Business & Professions Code § l7500, *et. seq.,* California Civil Code § 1750, *et seq*.,  and is otherwise grounds for restitution on the basis of quasi-contract/unjust enrichment.

## JURISDICTION AND VENUE

9.      Jurisdiction of this Court is proper under 28 U.S.C. § 1332(d)(2). Diversity jurisdiction exists as Plaintiff Ruiz is a resident of Chula Vista, California and Defendant Celsius is a Nevada corporation with its principal place of business in Boca Raton Florida. The amount in controversy exceeds $5,000,000 for the Plaintiff and members of the Class collectively, exclusive of interest and costs, by virtue of the combined purchase prices paid by Plaintiff and members of the putative Class, and the profits reaped by Defendant from its transactions with Plaintiff and the Class, as a direct and proximate result of the wrongful conduct alleged herein, and by virtue of the injunctive and equitable relief sought.

10.      Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391 because a substantial portion of the underlying transactions and events complained of occurred and affected persons and entities located in this judicial district, and Defendant has received substantial compensation from such transactions and business activity in this judicial district.

## PARTIES

11.      Plaintiff Jimy Ruiz is a resident of Chula Vista, California.

12.      Mr. Ruiz purchased a variety of Celsius Drink Products throughout the applicable class period, including but not limited to Sparkling Orange, Peach Mango

Green Tea, and Sparkling Grape Rush. The purchases were made at several stores in his surrounding area including, but not limited to, Walmart, Target, CVS and 7-11.

13.     Mr. Ruiz believed the representations on the Products' principal display panels -- that he was consuming beverages that contained the fruits depicted by name and vignette.

14.     He believed that Defendant lawfully marketed and sold the Products.

15.     Mr. Ruiz relied on Defendant's labeling and was misled thereby.

16.     Mr. Ruiz would not have purchased the Products, or would have purchased the Products on different terms had he known the truth.

17.     Mr. Ruiz was injured in fact and lost money as a result of Defendant's improper conduct.

18.     If Mr. Ruiz has occasion to believe that Defendant's marketing and labeling is truthful, non-misleading, and lawful, he would purchase Celsius beverages in the future.

19.     Defendant Celsius Holdings Inc. manufactures, markets and sells a variety of functional fitness beverages under the brand name Celsius. The Beverages are sold across a variety of retail segments including supermarkets, convenience stores, drug stores, nutritional stores, and mass merchants. Celsius is a Nevada corporation that maintains its principal place of business at 2424 N Federal Highway, Suite 208, Boca Raton, Florida 33431.

## GENERAL ALLEGATIONS

20.     Celsius develops, markets, sells and distributes a line of "functional calorie burning fitness beverages" under the Celsius brand name.[2] The brand consists

---

[2] Celsius Holdings, Inc, Annual Report Pursuant to Sections 13 or 15(D) of The Securities Exchange Act of 1934 For the fiscal year ended December 31, 2019 on Form 10-K ("Form 10-K").

of four product lines each of which offers several "fruit" beverages affected by the same labeling infirmity described herein.[3]

21.     Defendant operates in a crowded beverage space among a number of well-established and well-funded competitors.

22.     Over the last several years, consumers have increasingly moved towards clean label products, abandoning beverages laden with sugars, flavorings and empty calories in exchange for beverages that provide a range of health benefits.

23.     To that end, Celsius created a niche within the fitness beverage marketplace imbuing its Products with a health-halo based on a series of structure function claims (e.g. "healthy energy" and "accelerates metabolism"), inclusion of healthful ingredients (e.g. green team guarana, ginger root, vitamins and minerals), and free-from claims (e.g. "no preservatives artificial colors or flavors").[4] "We seek to combine nutritional science with mainstream beverages by using our proprietary thermogenic (calorie-burning) MetaPlus ® formulation, while fostering the goal of healthier everyday refreshment by being as natural as possible without the artificial preservatives often found in many energy drinks and sodas."[5]

24.     Celsius subsequently undertook significant marketing efforts aimed at building brand awareness and promoting its Beverages.

---

[3] The Celsius Product Line includes: Sparkling Peach Vibe, Sparkling Orange, Sparkling Wild Berry, Sparkling Grape Rush, Raspberry Acai Green Tea, Grapefruit Melon Green Tea, Sparkling Fuji Apple Pear, Sparkling Kiwi Guava, Sparkling Watermelon, Peach Mango Green Tea. The Celsius Heat Product Line includes: Jackfruit, Cherry Lime, Strawberry Dragon fruit, Blueberry Pomegranate. The Celsius BCAA Product Line includes: Sparkling Blood Orange Lemonade. The Celsius Stevia Product Line includes: Watermelon Berry, Sparkling Grapefruit, Sparkling Orange Pomegranate, Sparkling Cucumber Lime (collectively referred to as "Class Products").

[4] See, https://www.celsius.com/.

[5] Form 10-K at 1.

25.     Celsius' efforts paid off handsomely as single year revenues grew from $38,905,235 in 2018 to $59,659,320 in 2019.[6] In the third quarter of 2020 alone, the company reported $36.84 million in revenue, representing an 80.4% increase over revenue for the same period a year earlier.[7]

26.     Significantly, Celsius is keenly aware of its labeling obligations noting that, "[t]he production, distribution and sale of our products in the United States is subject to the Federal Food, Drug and Cosmetic Act, the Dietary Supplement Health and Education Act of 1994, various environmental statutes and various other federal, state and local statutes and regulations applicable to the production, transportation, sale, safety, advertising, labeling and ingredients of such products."[8]

27.     Despite its legal obligations, however, Celsius chose to deceptively label its beverages, obfuscating the material fact that they did not contain real fruit, but instead derived their flavor from highly processed, lab-synthesized flavoring packets.

28.     By way of example, the Sparkling Orange Product's principal display panel undeniably presents "orange" as the beverage's characterizing flavor by both name and vignette.

---

[6] *Id.* at 9.

[7] *Celsius Delivers Record Third Quarter Revenue of $36.8M, up 80%*, Market Insider, November 12, 2020, available at https://markets.businessinsider.com/news/stocks/celsius-delivers-record-third-quarter-revenue-of-36-8m-up-80-1029796679.

[8] Form 10-K at 9.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21




Other Ingredients: Carbonated Filtered Water, Citric Acid, Natural Flavor, Sucralose, Beta-carotene for Color.
Contains: 200mg total caffeine per serving.

22      29.    Despite being labeled and characterized as an orange beverage, however,

23  the Product contains no orange. Instead, it is flavored by an ingredient described only

24  as "Natural Flavor," and derives its orange color from a pigment (beta-carotene).

25      30.    Failing to indicate, on the front label, that a product does not contain its

26  characterizing ingredient, but rather, is flavored by lab synthesized chemicals, is

27  deceptive, misleading and in violation of state and common laws designed to protect

28  consumers and to promote consist, honest and transparent labeling.

1

2

**A.      Flavoring in a Product is a Material Consideration to a Reasonable Consumer**

3

4        31.     Over the last decade, "Natural Flavors" have become ubiquitous

5   ingredients in food and beverage formulations. According to the Environmental

6   Working Group, which rates more than 80,000 foods on their degree of nutrition,

7   ingredient and processing concerns, "Natural Flavor" is the fourth most common

    ingredient on food labels with only salt, water and sugar mentioned more frequently.[9]

8

9        32.     The FDCA defines "natural flavor" as the "essential oil, oleoresin,

10  essence or extractive, protein hydrolysate, distillate, or any product of roasting,

11  heating or enzymolysis, which contains the flavoring constituents derived from a

12  spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud,

13  root, leaf or similar plant material, meat, seafood, poultry, eggs, dairy products, or

14  fermentation products thereof, whose significant function in food is flavoring rather

    than nutritional." 21 C.F.R. § 101.22(a)(3).

15

16       33.     In elemental terms, a natural flavor is anything that can be extracted from

17  an animal or plant source. It is called "natural" because the original source of the

18  flavor additive is not man-made.[10] Unfortunately, despite their name, natural flavors

19  are complex, highly processed, amalgams of chemicals, carrier solvents, and

20  preservatives.[11] Despite originating from a single natural source, the finalized flavor

21

22  [9]  *Synthetic ingredients in Natural Flavors and Natural Flavors in Artificial Flavors*,

23  Environmental Working Group, available at
    https://www.ewg.org/foodscores/content/natural-vs-artificial-flavors/.

24

25  [10]  *Attention, Allergy Sufferers: Beware of Natural Flavors*, Food Safety News,
    December 2, 2015, available at https://www.foodsafetynews.com/2015/12/attention-

26  allergy-sufferers-beware-of-natural-flavors/.

27  [11] *What are Natural Flavors?*, Food Revolution Network, available at

28  https://foodrevolution.org/blog/natural-flavors/.

can contain as many as 250 chemically identified constituents, some of which are artificial and synthetic.[12]  Moreover, these additional chemicals can make up 80 to 90 percent of the flavor. [13]

34.     In addition to incorporating synthetic solvents and carrier systems, the base ingredient often times has no relation to the characterizing flavor of the product at all.[14]

35.     Natural flavors are added to foods and beverages for a variety of reasons including to replace flavors that were eliminated in processing and pasteurizing, or to help food taste fresh even when it is not. In Products where the characterizing

[12] *Is There Really Anything Natural About Natural Flavors?,* Suffolk University Journal of Health and Biomedical Law, April 4, 2019 available at https://sites.suffolk.edu/jhbl/2019/04/04/is-there-really-anything-natural-about-natural-flavors/.

[13]  *Synthetic ingredients in Natural Flavors and Natural Flavors in Artificial flavors*, EWG, available at https://www.ewg.org/foodscores/content/natural-vs-artificial-flavors/#:~:text=Federal%20Food%20and%20Drug%20Administration,juice%2C%20vegetable%20or%20vegetable%20juice%2C.  (These flavor mixtures often include amyl acetate, amyl butyrate, amyl valerate, ethyl butyrate, various aliphatic acid ester, ethyl acetate, ethyl valerate, ethyl isovalerate, ethyl pelargonate, vanillin, lemon essential oil, citral, citronellal, rose absolute, geraniol, orange essential oil, geranium essential oil, aldehyde $C_{10}$, ethyl heptanoate, acetaldehyde, aldehydes $C_{14}$ and $C_{16}$, styralyl acetate, dimethyl benzyl carbinyl acetate, benzyl formate, phenyl ethyl isobutyrate, cinnamyl isovalerate, anise essential oil, esters of colophony and benzaldehyde and may contain terpenyl isovalerate, isopropyl isovalerate, citronellyl isovalerate, geranyl isovalerate, benzyl isovalerate, cinnamyl formate, isopropyl valerate, butyl valerate, methyl allyl butyrate and potentially the synthetic ingredients cyclohexyl acetate, allyl butyrate, allyl cyclohexylvalerate, allyl isovalerate and cyclohexyl butyrate).

[14] *Id.; What's* inside natural flavors?, Food Business News, December 3, 2020, available at https://www.foodbusinessnews.net/articles/17385-whats-inside-natural-flavors.

ingredient was never intended to be in the formulation, and is therefore wholly absent, flavors not only provide a taste and smell profile, but are specifically designed to entice and addict the consumer to the product. [15]

36.    "How a food tastes is largely determined by the volatile chemicals in the food. Chemicals that give food a specific smell are extremely important because smell makes up 80 to 90 percent of the sense of taste." [16] "A great deal of scientific engineering and design time goes into crafting flavors for processed foods. This specialized work is done by just 500 professional flavorists who are responsible for the majority of flavors in nearly all food processed in the U.S."[17]

37.    As made plain in a 60 Minutes expose on food flavorists, one of their primary goals is to create flavors that make foods and beverages addictive.[18]

38.    Unfortunately for the consuming public, manufacturers are not required to list the sub-ingredients that constitute these flavors – a fact which results in the ability of manufacturers to obfuscate dozens of chemicals from disclosure.[19]

39.    "On an ingredient label, "natural flavor" can be a sort of black box, enclosing dozens of components, including flavor chemicals, flavor modifiers, and solvents, none of which have to be individually disclosed. Many companies will use

---

[15] *What does 'natural flavors' really mean?*, Washington Post, July 25, 2017, available at https://www.washingtonpost.com/lifestyle/wellness/what-does-natural-flavors-really-mean/2017/07/24/eccdc47e-67f7-11e7-a1d7-9a32c91c6f40_story.html.

[16] *Supra* at fn. 9.

[17] *Id.*

[18] *The Flavorists*, *Tweaking Tastes and Creating Cravings,* CBS News, November 27, 2011, available at https://www.youtube.com/watch?v=a7Wh3uq1yTc.

[19] *What are Natural Flavors? The Truth About This "Natural" Ingredient,* Public Good, April 2, 2020, available at https://blog.publicgoods.com/what-are-natural-flavors/.

additives like propylene glycol when they can disguise them under the benign-sounding catchall "natural flavors"—even if they would reject them as individually listed ingredients." [20]

40.    This has resulted in a growing distrust of natural flavors by the consuming public.[21]  A 2018 report from Label Insight and the Food Marketing Institute found 93% of consumers find it important for brands and manufacturers "to provide detailed information about what is in food and how it's made" and "[t]hree quarters of shoppers in 2018 would switch brands for transparency." [22]

41.    Indeed, the most significant trend driving change in the food and beverage industry right now is transparency. Consumers want to know and understand what ingredients are going into their products, which is why so many products are simplifying and shortening ingredient lists. [23] "Clean labels with high ethical values are more important than ever, particularly to a growing segment of consumers with special dietary needs, which means, lab-created artificial and natural flavors are not in demand; consumers want real ingredients from nature." [24] Moreover, today, brands are

---

[20] *Clean label's dirty little secret*, The Counter, February 1, 2018, available at https://thecounter.org/clean-label-dirty-little-secret/.

[21] *What are Natural Flavors? Get the Facts!,* Real Mom Nutrition, September 24, 2019, available at https://www.realmomnutrition.com/natural-flavors/.

[22] *The State of Transparency - 2016 vs 2018*, Label Insight, September 18, 2018, available at https://blog.labelinsight.com/the-state-of-transparency-2016-vs-2018.

[23] *Top Trends Driving Change In The Food Industry*, Forbes, February 16, 2019, available at https://www.forbes.com/sites/juliabolayanju/2019/02/16/top-trends-driving-change-in-the-food-industry/?sh=302c9e636063.

[24] *Id.*

also questioning whether natural flavors, preservatives and sweetener are really clean.[25]

42.    In response, a number of food manufacturers have become more "honest and real about what's going into their food as consumers demand transparency and clean labeling."[26] Some Celsius competitors, such as Spindrift Seltzer, realized the fallacy of natural flavors and changed their formulation to include real ingredients (i.e., fruit). Prior to making the change, Spindrift CEO Bill Creelman had tried to get to the bottom of what natural flavors were being used in his company's drinks. "When I asked our supplier, no one would tell me, he said. It was time to make a change."[27]

43.    Ultimately, manufacturers have a choice on how to flavor their beverages. While some will use real ingredients in their product formulations, others will choose a variety of flavorings. They all will compete for consumers on the basis of those choices.

44.    Recognizing that these choices (i.e., the difference between products with real ingredients versus those that are flavored) are material to the reasonable consumer, the law imposes strict rules regarding the labeling of products that have been flavored. These laws ensure consistent labeling among competitive products and are designed to clearly convey the nature of the product, minimize consumer confusion, and enable informed purchasing decisions.

---

[25] *See, Clean Label 2.0: Natural Flavors and preservatives, pesticide residues, and Non-GMO in the spotlight*, Food Navigator USA, April 26, 2017, available at https://www.foodnavigator-usa.com/Article/2017/04/27/Clean-label-2.0-From-natural-flavors-to-synbio-and-pesticide-residues.

[26] *The "Natural Flavors" Ingredient Is a Total Lie*, The Daily Meal, June 26, 2017, available at https://www.thedailymeal.com/healthy-eating/natural-flavors-ingredient-total-lie.

[27] *Id.*

---

**B.     The Federal Food Drug & Cosmetic Act**

45.      The Federal Food, Drug & Cosmetic Act ("FDCA") broadly regulates the sale of food and beverages to the consuming public.  21 U.S.C §301.  It was promulgated in significant part to prevent consumer deception and was principally implemented through the creation of a uniform system of labeling on which consumers could rely to make informed purchasing decisions.

46.      By extensively regulating the labeling of foods and beverages, the FDCA and its implementing regulations have identified the words and statements that must or may be included on labeling and have specified how prominently and conspicuously those words and statements must appear. These provisions ensure that statements are presented on labels in such a way as to likely be read and understood by the ordinary person. 21 U.S.C. §343(f). The FDCA consists of hundreds of sections and subsections, the following of which bear direct relevance to the case at bar.

47.      The FDCA prohibits the misbranding of any food. 21 U.S.C. §331(b).[28] Generally, a  food is misbranded if, among other things, its labeling is false or misleading.  21 U.S.C. §343. [29]  In addition to this general mandate, the FDCA contains specific rules which manufacturers must follow to ensure their products are properly labeled and understood by the reasonable consumer.  Among them, 21 C.F.R. §101.22, which provides:

---

[28] The term food broadly means "articles used for food or drink for man…" 21 U.S.C §321(f) and incorporates beverages such as the Products which are the subject of this litigation.

[29] California's Sherman Food, Drug and Cosmetic Law ("Sherman Law"), which adopts the FDCA in its entirety, identically provides that, "[a]ny food is misbranded if its labeling is false or misleading in any particular." California Health & Safety Code, Article 6, §110660.

(i) If the label, labeling, or advertising of a food makes any direct or indirect representations with respect to the primary recognizable flavor(s), by word, vignette, e.g., depiction of a fruit, or other means, or if for any other reason the manufacturer or distributor of a food wishes to designate the type of flavor in the food other than through the statement of ingredients, such flavor shall be considered the characterizing flavor and shall be declared in the following way:

(1) If the food contains no artificial flavor which simulates, resembles or reinforces the characterizing flavor, the name of the food on the principal display panel or panels of the label shall be accompanied by the common or usual name of the characterizing flavor, e.g., "vanilla", in letters not less than one-half the height of the letters used in the name of the food, except that:

(i) If the food is one that is commonly expected to contain a characterizing food ingredient, e.g., strawberries in "strawberry shortcake", and the food contains natural flavor derived from such ingredient and an amount of characterizing ingredient insufficient to independently characterize the food, or the food contains no such ingredient, the name of the characterizing flavor may be immediately preceded by the word "natural" and shall be immediately followed by the word "flavored" in letters not less than one-half the height of the letters in the name of the characterizing flavor, e.g., "natural strawberry flavored shortcake," or "strawberry flavored shortcake."

(ii) If none of the natural flavor used in the food is derived from the product whose flavor is simulated, the food in which the flavor is used shall be labeled either with the flavor of the product from which the flavor is derived or as "artificially flavored."

(iii) If the food contains both a characterizing flavor from the product whose flavor is simulated and other natural flavor which simulates, resembles or reinforces the characterizing flavor, the food shall be labeled in accordance with the introductory text and paragraph (i) (1)(i) of this section and the name of the food shall be immediately followed by the

words "with other natural flavor" in letters not less than one-half the height of the letters used in the name of the characterizing flavor.

48.     Class Products each bear a label which by word and/or word and vignette characterizes the Beverage's primary recognizable flavor as one derived from a single or combination of fruits. Despite conveying to the reasonable consumer that the beverage contains the ingredient (i.e., fruit) from which its primary characterizing flavor is derived, in truth, the Beverages are entirely devoid of such ingredients. Instead, the primary recognizable flavor is derived from a lab synthesized flavoring packet consisting of potentially hundreds of undisclosed sub-ingredients.

49.     By law, if a product does not contain its characterizing ingredient, that fact must be stated on the principal display panel in order to properly inform consumers that this is a flavored product. To the extent that the "Natural Flavor" in Class Products originate from their characterizing ingredient (e.g., the natural flavor is derived from an orange), the front label must indicate that it is "Orange Flavored" or "Natural Orange Flavored." However, to the extent that the "Natural Flavor" is derived from a natural ingredient other than a Product's charactering ingredient, (i.e., something other than an orange), the front label must indicate that the product is "Artificially Flavored." Finally, if the Product contains more than one 'natural flavor,' then it must additionally indicate on the principal display panel that is has also been flavored "with other natural flavors."

50.     Under any scenario, Celsius has failed to indicate that its Products are flavored – a failure that is in violation of the law and operates as deceit upon consumers.

51.     In January 1973, the FDA Commissioner published a proposal to revise the requirements contained §1.12 of the FDCA (now §101.22) with respect to the labeling of flavor contained in food. The FDA solicited public commentary, which it subsequently summarized and responded to. Federal Register Vol. 38, No. 231,

1   December 3, 1973. Among other things, the FDA made clear that the purpose of these

2   regulations was to provide labeling uniformity among marketplace participants in

3   order to prevent consumer confusion and deception.

4       52.    Setting forth the general standards applicable to the flavoring regulations,

5   the FDA recognized that although "[i]t is not possible to set out all the circumstances

6   under which a flavor representation is or is not implied, [a]ny use of a vignette

7   showing a fruit or vegetable clearly constitutes such a representation…. [Moreover,]

8   use of a specific fruit flavor in the food name, such as "orange soda," does constitute

9   such a representation and requires compliance with §1.12(i)." 38 Fed. Reg. at 33285.

10      53.    Some stakeholders argued that flavor designations should not be required

11  on the front-of-package, but rather be limited to the statement of ingredients. While

12  the Commissioner agreed that in instances where the manufacturer makes no direct or

13  indirect representation with respect to the flavor of a product other than in the

14  ingredients statement, no designation was necessary on the principal display panel.

15  However, where flavor representations are made on the principal display panel ***"it is***

16  ***necessary to establish a uniform system of flavor designation to dispel any***

17  ***confusion or misrepresentation."*** 38 Fed. Reg. at 33286. ***"The difference between a***

18  ***product that contains a characterizing food ingredient and a product that contains***

19  ***no such ingredient [] is not at all subtle, and is very important to the value of the***

20  ***product and thus to the consuming public."*** *Id.* at 33285 (emphasis added).

21      54.    The Commissioner also confirmed that when an otherwise "natural flavor

22  [] is not derived from the product whose flavor is simulated…., the product is properly

23  labeled as artificially flavored." *Id.* at 33285-6.

24      55.    In 1993 the FDA once again considered amendments to certain

25  regulations of the FDCA.  The FDA published the proposed amendments for public

26  comment and provided a similar commentary process as in 1973.  While considering

27  the applicability of §101.22 in light of more specific regulations such as §102.3, the

28  FDA reconfirmed the function and importance of §101.22.

"Both §§ 101.22 and 102.33 are intended to ensure that the label communicates essential information to consumers. These provisions are intended to provide manufacturers with flexibility for labeling products while providing consumers with information that they need to determine the nature of the product. The agency concludes that both kinds of label information discussed here are essential to adequately describe the nature of the product. One type of information informs the consumer when flavoring substances have been added to the product. The other type describes other aspects of the basic nature of the product." 58 FR 2897, *2919.  **Ultimately, "….a consumer who wants the food because of its particular…. flavor is entitled to examine a label that reveals facts material in light of the representations made…."** 58 Fed. Reg. 2897 *2898 (emphasis added).

## C.   Product Labels Matter to Consumers

56.    "Food is the most advertised commodity in the United States and food corporations spend on average over $36 billion a year on marketing and advertising."[30]

57.    Front-of-Package marketing has become ubiquitous in recent years as marketplace competitors vie for consumer attention. It has become the most important part of the food label as consumers attempt to make quick, yet informed purchasing decisions.[31] Indeed, a survey conducted by the FDA determined that 67% of

---

[30] Garavente, Angelina, *How Has The Food Industry Manipulated The Way Consumers Perceive Food And Health?* (2018). Honors College Theses. 173. Available at https://digitalcommons.pace.edu/honorscollege_theses/173.

[31] *See, e.g.* Mark Becker, *et al*, *Front of Pack Labels Enhance Attention to Nutrition Information in Novel and Commercial Brands*, Food Policy Volume 56, October 2015, Pages 76-86. Available at https://doi.org/10.1016/j.foodpol.2015.08.001 ("Our results provide clear evidence that FOP labels are more effective at attracting attention

1  respondents used Front-of-Package labels when making purchasing decisions.[32] This

2  is confirmed by numerous studies which similarly found that consumers often rely on

3  Front-of-Package claims to inform their purchasing decisions, and that Front-of-

4  Package claims can have a "strong impact on their food purchases."[33]

5      58.    While manufacturers are generally free to add claims to the Front-of-

6  Package consistent with their obligations under the law, "[e]merging evidence

7  indicates that many labels are misleading in conveying properties of food products and

8  bear a wide array of confusing messages."[34] This makes compliance with FDCA

9  labeling requirements even more critical in order to provide consumers with

10  recognizable standards and to prevent deception.

11      59.    Not only has Defendant violated the clear letter of the FDCA, but it has

12  separately acted to deceive and mislead consumers into purchasing products with

13  qualities and attributes that they simply did not have in violation of the laws alleged

14  herein.

---

than the traditional NFP [Nutrition Facts Panel], and that this advantage is attributable to both the location").

[32] Hawley, K. L., Roberto, C. A., Bragg, M. A., Liu, P. J., Schwartz, M. B., & Brownell, K. D. (2013). *The Science On Front-Of-Package Food Labels*. Public Health Nutrition, 16(3), 430–439. Available at http://doi.org/10.1017/S1368980012000754.

[33] *Healthy Through Presence or Absence, Nature or Science? A Framework for Understanding Front-of-Package Food Claims*, Journal of Public Policy & Marketing 2019, Vol. 38(2) 172-191 available at https://journals.sagepub.com/doi/pdf/10.1177/0743915618824332.

[34] Jennifer L. Pomeranz , *Front-of-Package Food and Beverage Labeling New Directions for Research and Regulation*, Am J Prev Med 2011;40(3):382–385 available at https://pubmed.ncbi.nlm.nih.gov/21335274/.

**D.    Competitor Products**

60.    Celsius is fully aware of its labeling obligations under state and federal laws as well as its overarching duty to honestly inform consumers about the products it is selling.

61.    It is axiomatic that "the marketing industry is based on the premise that labels matter—that consumers will choose one product over another similar product based on its label and various tangible and intangible qualities they may come to associate with a particular source."[35] The FDCA was promulgated in part to prevent consumer deception by creating a uniform system of labeling on which consumers can rely in comparing similar products and thereafter make informed purchasing decisions. This is especially important with respect to the use of flavorings which have rapidly become ubiquitous in food formulations. It is critical, therefore, that manufacturers label their products consistently as prescribed law. A review of some competitive product labels illustrates this clearly. By way of example, Gatorade Zero (Fig. 1) and Powerade (Fig. 2), like Celsius, are flavored with "natural flavors. Unlike Celsius, however, they each clearly convey to consumers on the principal display panel that their products are flavored.  In contrast, Spindrift (Fig. 3), an orange sparkling water which does not contain flavorings and therefore does not require a qualification on its principal display panel, properly conveys to the consumer that their product contains its characterizing ingredients.

---

[35] *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 328; *FTC v. Proctor & Gamble Co.* (1967) 386 U.S. 568, 572 (noting the central role of advertising and sales promotion in generating market share where the competing products are functionally identical).

Fig.1



Water, citric acid, sodium citrate, salt, monopotassium phosphate, gum arabic, natural flavor, sucralose, acesulfame potassium, sucrose acetate isobutyrate, glycerol ester of rosin, yellow 6.
*Same electrolytes as regular Gatorade.

Fig 2.



Ingredients: Water, High Fructose Corn Syrup, less than 0.5% of: Citric Acid, Salt and Mono-Potassium Phosphate and Magnesium Chloride (Electrolyte Sources), Gum Acacia, Natural Flavors, Glycerol Ester of Rosin, Yellow 5, Yellow 6, Vitamin B3 (Niacinamide), Vitamin B6 (Pyridoxine Hydrochloride), Vitamin B12, Ascorbic Acid (to protect taste), Calcium Disodium EDTA (to protect color).

Fig 3.

1
2
3
4
5
6
7
8
9
10
11
12
13
14



**INGREDIENTS:** CARBONATED WATER, ORANGE JUICE, ALPHONSO MANGO PUREE, CITRIC ACID.

**NO SUGAR ADDED**

15   62.   By failing to properly label its products, Celsius has mislead and
16   deceived consumers.

17   63.   As a result of Defendant's unlawful and deceptive conduct, Plaintiff and
18   members of the Class have been harmed.

19
20                          **ECONOMIC INJURY**

21   64.   Plaintiff sought to buy products that were lawfully labeled, marketed and
22   sold.

23   65.   Plaintiff saw and relied on Defendant's misleading labeling of its
24   Products.

25   66.   Plaintiff believed that the Products purchased contained real fruit.

26   67.   Plaintiff believed that the Products were lawfully marketed and sold.

27   68.   In reliance on the claims made by Defendant regarding the qualities of its
28   Products, Plaintiff paid a price premium.

69.     As a result of his reliance on Defendant's misrepresentations, Plaintiff received  Products that lacked the promised ingredients which he reasonably believed they contained.

70.     Plaintiff received Products that were unlawfully marketed and sold.

71.     Plaintiff lost money and thereby suffered injury as he would not have purchased these Beverages and/or paid as much for them absent the misrepresentation.

72.     Defendant knows that the inclusion of characterizing ingredients are material to a consumer's purchasing decision.

73.     Plaintiff altered his position to his detriment and suffered damages in an amount equal to the amounts he paid for the Beverages he purchased, and/or in additional amounts attributable to the deception.

74.     By engaging in the false and deceptive conduct alleged herein Defendant reaped, and continues to reap financial benefits in the form of sales and profits from its Products.

75.     Plaintiff, however, would be willing to purchase Celsius Products again in the future should he be able to rely on Defendant's marketing as truthful and non-deceptive.

## **CLASS ACTION ALLEGATIONS**

76.     Plaintiff brings this action on behalf of himself and on behalf of classes of all others similarly situated consumers defined as follows:

> a.  **National**: All persons in the United States who purchased Class Products in the United States during the Class Period.
>
> b.  **California** All persons in California who purchased the Class Products in California during the Class Period.
>
> c.  **Class Period** is the maximum time allowable as determined by the statute of limitation periods accompanying each cause of action.

77.     Plaintiff brings this Class pursuant to Federal Rule of Civil Procedure 23(a), and 23(b)(1), 23(b)(2), 23(b)(3) and 23(c)(4).

78.     Excluded from the Classes are: (i) Defendant and its employees, principals, affiliated entities, legal representatives, successors and assigns; and (ii) the judges to whom this action is assigned.

79.     Upon information and belief, there are tens of thousands of members of the Class. Therefore, individual joinder of all members of the Class would be impracticable.

80.     There is a well-defined community of interest in the questions of law and fact affecting the parties represented in this action.

81.     Common questions of law or fact exist as to all members of the Class. These questions predominate over the questions affecting only individual Class members. These common legal or factual questions include but are not limited to:

    a.  Whether Defendant marketed, packaged, or sold the Class Products to Plaintiff and those similarly situated using false, misleading, or deceptive statements or representations;

    b.  Whether Defendant omitted or misrepresented material facts in connection with the sales of its Products;

    c.  Whether Defendant participated in and pursued the common course of conduct complained of herein;

    d.  Whether Defendant has been unjustly enriched as a result of its unlawful business practices;

    e.  Whether Defendant's actions violate the Unfair Competition Law, Cal. Bus. & Prof. Code §§17200, *et seq*. (the "UCL");

    f.  Whether Defendant's actions violate the False Advertising Law, Cal. Bus. & Prof. Code §§17500, *et seq*. (the "FAL");

    g.  Whether Defendant's actions violate the Consumers Legal Remedies Act, Cal. Civ. Code §§1750, *et seq*. (the "CLRA");

1

2

    h.  Whether Defendant should be enjoined from continuing the above-described practices;

3

4

    i.  Whether Plaintiff and members of the Class are entitled to declaratory relief; and

5

6

7

    j.  Whether Defendant should be required to make restitution, disgorge profits, reimburse losses, and pay damages as a result of the above-described practices.

8

9

10

11

    82.    Plaintiff's claims are typical of the claims of the Class, in that Plaintiff was a consumer who purchased Defendant's Products. Plaintiff is no different in any relevant respect from any other Class member who purchased the Products, and the relief sought is common to the Class.

12

13

14

15

16

    83.    Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the members of the Class he seeks to represent, and he has retained counsel competent and experienced in conducting complex class action litigation. Plaintiff and his counsel will adequately protect the interests of the Class.

17

18

19

20

21

22

23

24

25

26

27

    84.    A class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual Class member likely will be relatively small, especially given the relatively small cost of the Products at issue and the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's conduct. Thus, it would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Moreover, even if members of the Class could afford individual actions, it would still not be preferable to class-wide litigation. Individualized actions present the potential for inconsistent or contradictory judgments. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

28

85.     In the alternative, the Class may be certified because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate preliminary and final equitable relief with respect to each Class.

86.     The requirements for maintaining a class action pursuant to Rule 23(b)(2) are also met, as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## FIRST CAUSE OF ACTION
### (Breach of Express Warranty, Cal. Com. Code §2313)

87.     Plaintiff incorporates each and every allegation contained in the paragraphs above as if restated herein.

88.     Defendant made express warranties to Plaintiff and members of the Class that the  Products they purchased contained fruit characterized by name and vignette on the Products' principal display panel.

89.     The express warranties made to Plaintiff and members of the Class appear on every Product label. This warranty regarding the nature of the Product marketed by Defendant specifically relates to the goods being purchased and became the basis of the bargain.

90.     Plaintiff and the Class purchased the Products in the belief that they conformed to the express warranties that were made on the Products' labels.

91.     Defendant breached the express warranties made to Plaintiff and members of the Class by failing to supply goods that conformed to the warranties it made. As a result, Plaintiff and members of the Class suffered injury and deserve to be compensated for the damages they suffered.

92.     Plaintiff and the members of the Class paid money for the Products. However, Plaintiff and the members of the Class did not obtain the full value of the advertised Products. If Plaintiff and other members of the Class had known of the true

nature of the Products, they would not have purchased them or paid less for them. Accordingly, Plaintiff and members of the Class have suffered injury in fact and lost money or property as a result of Defendant's wrongful conduct.

93.     Plaintiff and the Class are therefore entitled to recover damages, punitive damages, equitable relief such as restitution and disgorgement of profits, and declaratory and injunctive relief.

## SECOND CAUSE OF ACTION
### ("Unlawful" Business Practices in Violation of
### The Unfair Competition Law ("UCL"), Bus. & Prof. Code §§17200, *et seq.*)

94.     Plaintiff incorporates each and every allegation contained in the paragraphs above as if restated herein.

95.     The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code §17200.

96.     A business act or practice is "unlawful" if it violates any established state or federal law.

97.     Defendant's acts, omissions, misrepresentations, practices, and/or non-disclosures concerning the Products alleged herein, constitute "unlawful" business acts and practices in that they violate the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§301, et seq. and its implementing regulations, including, at least, the following sections:

   a. 21 U.S.C. §343(a), which deems food misbranded when its labeling contains a statement that is false or misleading in any particular;

   b. 21 C.F.R. §102.5(a)-(d), which prohibits the naming of foods so as to create an erroneous impression about the presence or absence of ingredient(s) or component(s) therein;

c. 21 CFR §101.22 pertaining to the labeling requirements when products do not contain their characterizing ingredients but instead are flavored;

d. 21 U.S.C. §§331and 333, which prohibits the introduction of misbranded foods into interstate commerce.

98.   California's Sherman Food, Drug, and Cosmetic Law ("Sherman Law"), Cal. Health & Safety Code §109875 *et seq*., broadly prohibits the misbranding of food. Cal. Health & Safety Code §110765; *See, also* Cal. Health & Safety Code §110660 ("Any food is misbranded if its labeling is false or misleading in any particular."). The Sherman Law incorporates all food labeling regulations and any amendments to those regulations adopted pursuant to the Food, Drug, and Cosmetic Act of 1938  as the food labeling regulations of California. Cal. Health & Safety Code §§110100(a), 110665, 110670.

99.   As described in detail above, by failing to label the Products in a manner that accurately represents its contents, Defendant generally violates 21 U.S.C. §343(a)(1) ("a food shall be deemed to be misbranded if its labeling is false or misleading in any particular") as incorporated by California's Sherman Law. Independently, by mislabeling the Products, Defendant violates Cal. Health & Safety Code § 110660 ("any food is misbranded if its labeling is false or misleading in any particular.")

100.   Defendant violated and continues to violate the Sherman Law, Article 6, Section 110660 and hence has also violated and continues to violate the "unlawful" prong of the UCL through the false labeling of its Product.

101.   Defendant's identical conduct that violates the Sherman Law, also violates FDCA §403(a)(1), 21 U.S.C. §343(a)(1), which declares food misbranded under federal law if its "labeling is false and misleading in any particular." This identical conduct serves as the sole factual basis of each cause of action brought by this Complaint, and

1   Plaintiff does not seek to enforce any of the state law claims to impose any standard of
2   conduct that exceeds that which would violate FDCA.

3       102.   By committing the unlawful acts and practices alleged above, Defendant
4   has engaged, and continues to be engaged, in unlawful business practices within the
5   meaning of California Business and Professions Code §§17200, *et seq*.

6       103.   Through its unlawful acts and practices, Defendant has obtained, and
7   continues to unfairly obtain, money from members of the Class. As such, Plaintiff
8   requests that this Court cause Defendant to restore this money to Plaintiff and all
9   members of the Class, to disgorge the profits Defendant made on these transactions,
10  and to enjoin Defendant from continuing to violate the Unfair Competition Law or
11  violating it in the same fashion in the future. Otherwise, the Class may be irreparably
12  harmed and denied an effective and complete remedy if such an order is not granted.

13

14                      **THIRD CAUSE OF ACTION**
                    **("Unfair" Business Practices in Violation of**
15  **The Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200, *et seq*.)**

16      104.   Plaintiff incorporates each and every allegation contained in the
17  paragraphs above as if restated herein.

18      105.   The UCL defines unfair business competition to include any "unlawful,
19  unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or
20  misleading" advertising. Cal. Bus. Prof. Code §17200.

21      106.   A business act or practice is "unfair" under the Unfair Competition Law if
22  the reasons, justifications and motives of the alleged wrongdoer are outweighed by the
23  gravity of the harm to the alleged victims.

24      107.   Defendant has violated, and continues to violate, the "unfair" prong of the
25  UCL through its misleading description of the Products. The gravity of the harm to
26  members of the Class resulting from such unfair acts and practices outweighs any
27  conceivable reasons, justifications, or motives of Defendant for engaging in such

28

1    deceptive acts and practices. By committing the acts and practices alleged above,

2    Defendant had engaged, and continued to engage, in unfair business practices within

3    the meaning of California Business and Professions Code §§17200, *et seq.*

4        108.   Through its unfair acts and practices, Defendant obtained, and continued

5    to unfairly obtain, money from members of the Class. As such, Plaintiff has been injured

6    and requests that this Court cause Defendant to restore this money to Plaintiff and the

7    members of the Class, to disgorge the profits Defendant had made on its Products, and

8    to enjoin Defendant from continuing to violate the Unfair Competition Law or violating

9    it in the same fashion in the future. Otherwise, the Class may be irreparably harmed and

10   denied an effective and complete remedy if such an Order is not granted.

11

12                            **FOURTH CAUSE OF ACTION**

13   **("Fraudulent" Business Practices in Violation of**
     **The Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200, *et seq.*)**

14

15       109.   Plaintiff incorporates each and every allegation contained in the

16   paragraphs above as if restated herein.

17       110.   The UCL defines unfair business competition to include any "unlawful,

18   unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or

19   misleading" advertising. Cal. Bus. & Prof. Code §17200.

20       111.   A business act or practice is "fraudulent" under the Unfair Competition

21   Law if it actually deceives or is likely to deceive members of the consuming public.

22       112.   Defendant's acts and practices of mislabeling its Products in a manner to

23   suggest they principally contained their characterizing ingredients.

24       113.   As a result of the conduct described above, Defendant has been, and will

25   continue to be, unjustly enriched at the expense of Plaintiff and members of the

26   proposed Class. Specifically, Defendant has been unjustly enriched by the profits they

27   have obtained from Plaintiff and the Class from the purchases of their Products.

28

---

COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF

114.   Through its fraudulent acts and practices, Defendant has improperly obtained, and continues to improperly obtain, money from members of the Class. As such, Plaintiff requests that this Court cause Defendant to restore this money to Plaintiff and the Class, to disgorge the profits Defendant has made, and to enjoin Defendant from continuing to violate the Unfair Competition Law or violating it in the same fashion in the future. Otherwise, the Class may be irreparably harmed and denied an effective and complete remedy if such an Order is not granted.

## FIFTH CAUSE OF ACTION
### (False Advertising in Violation of
### California Business & Professions Code §§ l7500, *et seq*.)

115.   Plaintiff incorporates each and every allegation contained in the paragraphs above as if restated herein.

116.   Defendant uses advertising and packaging to sell its Products. Defendant disseminates advertising regarding its Products which by its very nature is deceptive, untrue, or misleading within the meaning of California Business & Professions Code §§17500, *et seq.* because those advertising statements contained on the labels are misleading and likely to deceive, and continue to deceive, members of the putative Class and the general public.

117.   In making and disseminating the statements alleged herein, Defendant knew or should have known that the statements were untrue or misleading, and acted in violation of California Business & Professions Code §§17500, *et seq.*

118.   The misrepresentations and non-disclosures by Defendant of the material facts detailed above constitute false and misleading advertising and therefore constitute a violation of California Business & Professions Code §§17500, *et seq.*

119.   Through its deceptive acts and practices, Defendant has improperly and illegally obtained money from Plaintiff and the members of the Class. As such, Plaintiff requests that this Court cause Defendant to restore this money to Plaintiff and the

COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF

members of the Class, and to enjoin Defendant from continuing to violate California Business & Professions Code §§17500, *et seq.*, as discussed above. Otherwise, Plaintiff and those similarly situated will continue to be harmed by Defendant's false and/or misleading advertising.

120.   Pursuant to California Business & Professions Code §17535, Plaintiff seeks an Order of this Court ordering Defendant to fully disclose the true nature of its misrepresentations. Plaintiff additionally requests an Order: (1) requiring Defendant to disgorge its ill-gotten gains, (2) award full restitution of all monies wrongfully acquired by Defendant and (3), interest and attorneys' fees. Plaintiff and the Class may be irreparably harmed and denied an effective and complete remedy if such an Order is not granted.

## SIXTH CAUSE OF ACTION
### (Violation of the Consumers Legal Remedies Act, California Civil Code §§ 1750, *et seq.*)

121.   Plaintiff incorporates each and every allegation contained in the paragraphs above as if restated herein.

122.   This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code §§1750, *et seq.* (the "CLRA").

123.   Plaintiff and each member of the proposed Class are "consumers" within the meaning of Civil Code §1761(d).

124.   The purchases of the Products by consumers constitute "transactions" within the meaning of Civil Code §1761(e) and the Products constitute "goods" within the meaning of Civil Code §1761(a).

125.   Defendant has violated, and continues to violate, the CLRA in at least the following respects:

a. §1770(5) pertaining to misrepresentations regarding the characteristics of goods sold—specifying that misleading representations regarding ingredients violate the CLRA;

b. §1770(7) pertaining to misrepresentations regarding the standard, quality, or grade of goods sold; and

c. § 1770(9) pertaining to goods advertised with the intent not to provide what is advertised.

126. Defendant knew, or should have known, that the labeling of their Products violated consumer protection laws, and that these statements would be relied upon by Plaintiff and the members of the Class.

127. The representations were made to Plaintiff and all members of the Class. Plaintiff relied on the accuracy of the representations on Defendant's labels which formed a material basis for his decision to purchase the Products. Moreover, based on the very materiality of Defendant's misrepresentations uniformly made on or omitted from their Product labels, reliance may be presumed or inferred for all members of the Class.

128. Defendant carried out the scheme set forth in this Complaint willfully, wantonly, and with reckless disregard for the interests of Plaintiff and the Class, and as a result, Plaintiff and the Class have suffered an ascertainable loss of money or property.

129. Plaintiff and the members of the Class request that this Court enjoin Defendant from continuing to engage in the unlawful and deceptive methods, acts and practices alleged above, pursuant to California Civil Code §1780(a)(2). Unless Defendant is permanently enjoined from continuing to engage in such violations of the CLRA, future consumers of Defendant's Products will be damaged by their acts and practices in the same way as have Plaintiff and the members of the proposed Class.

130. Plaintiff served a CLRA demand pursuant to Civil Code §1782, via U.S. Certified Mail Return Receipt notifying Defendant of the conduct described herein and that such conduct was in violation of particular provisions of Civil Code §1770. The

demand was received by Defendant on November 30, 2020. More than thirty days have since elapsed without Defendant providing the requested relief thereby enabling Plaintiff to properly seek damages as provided under Civil Code §1780.

131.   Pursuant to Civil Code § 1780(a), Plaintiff and members of the class seek compensatory damages, punitive damages, restitution, disgorgement of profits, and an order enjoining Defendant from deceptively marketing the Products.

## SEVENTH CAUSE OF ACTION
### (Restitution Based On Quasi-Contract/Unjust Enrichment)

132.   Plaintiff incorporates each and every allegation contained in the paragraphs above as if restated herein.

133.   Defendant's conduct in enticing Plaintiff and the Class to purchase is Products with false and misleading packaging is unlawful because the statements contained on the Defendant's Product labels are untrue.

134.    Defendant took monies from Plaintiff and the Class for these Products and have been unjustly enriched at the expense of Plaintiff and the Class as result of their unlawful conduct alleged herein, thereby creating a quasi-contractual obligation on Defendant to restore these ill-gotten gains to Plaintiff and the Class.

135.  It is against equity and good conscience to permit Defendant to retain the ill-gotten benefits received from Plaintiff and Class members.

136.   As a direct and proximate result of Defendant's unjust enrichment, Plaintiff and the Class are entitled to restitution or restitutionary disgorgement in an amount to be proved at trial.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **PRAYER FOR RELIEF**

THEREFORE, Plaintiff, on behalf of himself and on behalf of the other members of the Class and for the Counts so applicable on behalf of the general public request an award and relief as follows:

A.      An order certifying that this action is properly brought and may be maintained as a class action, that Plaintiff be appointed Class Representative, and Plaintiff's counsel be appointed Lead Counsel for the Class.

B.      Restitution in such amount that Plaintiff and all members of the Class paid to purchase Defendant's Product or restitutionary disgorgement of the profits Defendant obtained from those transactions, for Causes of Action for which they are available.

C.      Compensatory damages for Causes of Action for which they are available.

D.      Other statutory penalties for Causes of Action for which they are available.

E.      Punitive Damages for Causes of Action for which they are available.

F.      A declaration and Order enjoining Defendant from marketing and labeling its Product deceptively, in violation of laws and regulations as specified in this Complaint.

G.      An Order awarding Plaintiff his costs of suit, including reasonable attorneys' fees and pre and post judgment interest.

H.      An Order requiring an accounting for, and imposition of, a constructive trust upon all monies received by Defendant as a result of the unfair, misleading, fraudulent and unlawful conduct alleged herein.

I.      Such other and further relief as may be deemed necessary or appropriate.

1

## **<u>DEMAND FOR JURY TRIAL</u>**

2      Plaintiff hereby demands a trial by jury on all causes of action or issues so triable.

3

4

DATED: January 22, 2021                Respectfully submitted,

5

6

7

8

s/ Michael D. Braun

9      **KUZYK LAW, LLP**

10     1999 Avenue of the Stars, Ste. 1100
       Los Angeles, California 90067

11     Telephone:   (213) 401-4100
       Facsimile:   (213) 401-0311

12     Email:  mdb@kuzykclassactions.com

13     *Counsel for Plaintiff*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28